# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$

## 2008-SC-000778-WC

RONALD MYERS          APPELLANT

ON APPEAL FROM COURT OF APPEALS
V.          CASE NO. 2007-CA-002331-WC
WORKERS' COMPENSATION BOARD NO. 04-79799

PRIVATE INVESTIGATIONS AND COUNTER
INTELLIGENCE, INC.; HONORABLE SHEILA
C. LOWTHER, ADMINISTRATIVE LAW JUDGE;
AND WORKERS' COMPENSATION BOARD          APPELLEES

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

An Administrative Law Judge (ALJ) determined that the claimant retained no permanent impairment from a physical injury and rejected a university evaluator's opinion that his work-related accident produced a permanent psychiatric impairment. The Workers' Compensation Board and the Court of Appeals affirmed. Appealing, the claimant asserts that the ALJ failed to comply with KRS 342.315 by stating specifically the reasons for rejecting the university evaluator's clinical findings and opinions concerning the psychiatric condition.

We affirm. The ALJ gave a reasonable explanation for the decision to rely on Drs. Granacher and Shraberg rather than on Dr. Mattingly, the university evaluator. Despite the claimant's assertions to the contrary, the explanation complied with KRS 342.315 and the decision was properly affirmed.

The claimant worked for the defendant-employer from April through August 2004. He testified that he was a leased employee and worked as a scoop operator in a coal mine. On August 2, 2004, he was struck on the head by the scoop's canopy, which was not secured properly and collapsed. He lost consciousness briefly and was taken by ambulance to the emergency room at Hazard Appalachian Regional Hospital, where he was admitted for observation. He did not return to work and testified subsequently that he experienced debilitating headaches on a daily basis and developed psychiatric symptoms. He alleged that the physical and psychiatric conditions rendered him permanently and totally disabled.

Pre-injury hospital records indicated that the claimant was treated in the emergency room in 1994 following a head-on motor vehicle accident. He was treated again in 1997 for complaints of left temporal pain and headaches following a motor vehicle accident. Treatment notes indicated that he attributed the injuries to a fight with the other driver after the accident. A CT scan of the brain performed for unknown reasons in 2002 was normal as was a CT scan performed after a head injury in 2003.

Post-injury hospital records indicated that a CT scan of the head and neck performed on August 3, 2004, revealed no abnormalities. The emergency

2

room diagnoses included a closed head injury with concussion and pain in the left upper quadrant and abdomen. Dr. Datu interpreted a CT scan of the head obtained on August 12, 2004, as showing that the mild soft tissue swelling along the left frontoparietal region present on the August 3 study had partially resolved. Dr. Datu found no intra- or extra-axial post-traumatic abnormalities. Dr. Desai interpreted a CT scan of the head obtained on November 23, 2004, as being normal.

Dr. Muha treated the claimant after the work-related accident. At a September 10, 2004, follow-up regarding cervical strain, the claimant complained of significant pain and a decreased range of motion in the neck as well as headaches. Dr. Muha reviewed an MRI of the cervical spine and the CT scans performed in August 2004 and found them to be normal. Convinced that the claimant was a candidate for occipital nerve blocks in March 2005, Dr. Muha referred him to Dr. Wright's pain management clinic. In October 2006, Dr. Muha referred the claimant to a neurologist, prescribed Lexipro for complaints of depression, and referred him to a psychiatrist.

Dr. Manney, an associate of Dr. Wright, saw the claimant for complaints of headaches that he associated with the work-related injury. Dr. Manney received a history of previous treatment for post-traumatic headaches and occipital neuralgia, including treatment by Dr. Swamy with Neurontin and Ultracet. The claimant reported that Neurontin was discontinued after an episode of severe depression and suicide attempt.[1] Dr. Manney diagnosed

---

[1] Other evidence indicates that the suicide attempt occurred in December 2004.

3

cervicalgia, cervicocranial syndrome, post-concussive headaches, occipital neuralgia, and depression and prescribed a series of injections.

Dr. Muckenhausen evaluated the claimant at the request of his attorney in May 2005. He complained of headaches, difficulty concentrating, and sleep disturbance; advised her of his adverse reaction to Neurontin, including his hospitalization following a suicide attempt; and reported that the injections prescribed by Dr. Manney gave him only transient relief. Dr. Muckenhausen diagnosed a head injury with chronic migraine headaches, cervical sephalgia, and occipital neuralgia; an organic brain syndrome associated with cognitive and affective changes, including severe depression; and a history of attempted suicide, possibly a side effect of medication. In her opinion, the conditions resulted from the work-related accident; produced a 40% permanent impairment rating; and precluded a return to work.

When deposed, Dr. Muckenhausen noted that the loss of consciousness after the accident confirmed that the claimant sustained an acute trauma and clinical alterations in his brain such as swelling. In her opinion, the CT scan she reviewed showed some evidence of swelling. She also opined that the claimant suffered from significant depression and was not a malingerer.

Dr. Graulich evaluated the claimant for the employer in July 2005, at which time he complained of headaches. After taking a history, performing a physical examination, and reviewing the treatment records and diagnostic tests, he concluded that the claimant sustained a minor traumatic head injury, with post-concussive headache syndrome, a whiplash injury, and possible

occipital neuralgia. He also thought that the claimant suffered from depression but deferred a diagnosis to a specialist. He found no evidence that the accident produced a permanent impairment, noting that the mild concussion would have resolved and permitted a return to work in four to six weeks. He did not think that further treatment was necessary. He stated subsequently that occipital neuralgia would not preclude a return to work or warrant a permanent impairment rating and, if present, should be ameliorated by injections and time. He noted in a third report that cervical spine x-rays taken in August 2005 were normal and disagreed with Dr. Muckenhausen's assumption that the use of Neurontin precipitated the suicide attempt. After reviewing a university evaluation performed subsequently by Drs. Tucker and Mattingly, he agreed with Dr. Tucker that the work-related accident caused no injury to the claimant's brain.

Dr. Shraberg, a psychiatrist, evaluated the claimant in August 2005 at the employer's request. He reported that the claimant presented in an intense and explosive manner and gave a confusing history of treatment following the work-related injury. Dr. Shraberg found him to be neurologically intact except for possible right occipital neuralgia and diagnosed major depression with a recent overdose. He thought that the claimant suffered from an underlying personality disorder with paranoid and narcissistic features, an intermittent explosive disorder, and an apparent cervical sprain or strain with possible concussion and occipital neuralgia. He concluded that the claimant's

symptoms resulted from the personality disorder rather than a condition that the accident aroused.

Dr. Tucker, a neurologist, performed a university evaluation in January 2006. The claimant complained of daily headaches, recited a history of violence since the accident, and reported the suicide attempt and subsequent treatment with antipsychotic medication. Dr. Tucker reported that it is unusual for a traumatic head injury to produce the type of physical and emotional outbursts that the claimant described. She reported that she was unable to assess his cognitive function because he did not cooperate with testing. She noted that a March 2005 toxicology report was positive for marijuana use, which was troubling because the drug was known to affect cognition negatively. She opined that no neurological condition precluded a return to full-time work or the normal activities of daily living and that medication could control the headaches and emotional lability he demonstrated during the evaluation. She noted that a second CT scan performed after the accident showed some left frontoparietal swelling but indicated in a supplemental report that the swelling was outside the brain parenchyma and did not apply pressure to the brain or compromise its function. The brain itself was normal.

Dr. Mattingly, who holds a Ph.D. in neuropsychology, also performed part of the university evaluation. She received a history that the claimant's treating physician recommended surgery for a blood clot after the accident, which he declined. Either he or his girlfriend, who accompanied him,

described the proposed surgery as drilling a hole in his skull to relieve pressure. He complained of forgetfulness, headaches, sensitivity to light and noise; a personality change characterized by explosiveness and a violent temper; and a suicide attempt. Although Dr. Mattingly performed a battery of neuro-cognitive studies, she reported that the results were unreliable due to his sub-optimal effort as well as his extreme affective distress and reported level of pain. She noted extreme emotional lability throughout the evaluation that ranged from uncontrollable crying to explosive anger; diagnosed major depression, single episode, severe; and recommended aggressive treatment. Noting that the claimant denied any previous history of anxiety, depression, or violence, she attributed his current symptoms to the work-related injury and resulting change in living circumstances. She rated his impairment as moderate with respect to activities of daily living and marked with respect to social functioning.

When deposed, Dr. Mattingly testified that she did not base her conclusions regarding causation on the diagnostic imaging studies. She relied instead on the history that she received from the claimant and his girlfriend and the lack of documentation of similar behavior before the accident. She acknowledged that the claimant's history of drug use could be significant depending on the level of use but concluded that his psychological distress probably resulted from the work-related injury.

Dr. Granacher evaluated the claimant for the employer in March 2006, which included an interview, various tests, and a medical records review.

Although he thought that the claimant probably had post-traumatic headaches after the accident, he concluded that the accident produced no mental or neuropsychiatric condition. He noted that the claimant reported a history of marijuana use for at least 10 years and complained of depression, sadness, and occasional suicidal thoughts but did not display the emotional lability or explosiveness that the other examiners noted. Dr. Granacher placed no confidence in tests of cognitive functioning because the claimant's effort was sub-optimal and he appeared to choose the wrong answer deliberately. The MMPI-2 also suggested symptom exaggeration. Dr. Granacher concluded that there was no evidence of a brain injury or neuropsychiatric disturbance from the accident. He assigned no permanent impairment or restrictions and stated that the claimant could return to work.

The ALJ relied on Dr. Tucker's testimony that any swelling detected after the accident did not affect brain function and that the accident caused no traumatic brain injury or permanent physical injury but rejected Dr. Mattingly's clinical findings and opinions regarding the alleged psychiatric condition. The ALJ noted specifically when summarizing the evidence that Dr. Mattingly received a history of a proposed brain surgery, which was troubling inasmuch as none of the medical records in evidence supported such a history. The ALJ acknowledged that Dr. Mattingly was "clearly well-qualified" but noted that she based her findings on a history received from the claimant and his girlfriend of a marked change in his behavior after the accident. In contrast, Dr. Shraberg attributed his behavior to a significant personality disorder of

8

lifetime duration. Not only did the MMPI-2 suggest symptom exaggeration, neither Dr. Mattingly nor Dr. Granacher was able to obtain reliable cognitive test results due to the claimant's suboptimal effort. The ALJ determined as a consequence that the claimant failed to prove a psychiatric impairment due to the accident and dismissed the claim.

We reject the claimant's assertion that the ALJ's rationale for disregarding Dr. Mattingly's clinical findings and opinions failed to comply with KRS 342.315. Magic Coal Company v. Fox, 19 S.W.3d 88 (Ky. 2000), explains that the purpose of KRS 342.315 is to provide an ALJ with testimony from a well-qualified and unbiased medical expert whose clinical findings and opinions are presumed to reflect the injured worker's condition accurately unless rebutted.[2] Rejecting an argument that KRS 342.315 requires clear and convincing evidence to rebut a university evaluator's testimony, the court determined that a university evaluator's clinical findings and opinions constitute substantial evidence of the worker's actual condition and that an ALJ must state a reasonable basis for rejecting them.

A medical opinion is no more reliable than the evidence on which it is based. Thus, an ALJ is not required to rely on an opinion that a physician bases on a medical history that has been sufficiently impeached.[3] Nor is an ALJ required to rely on an opinion that a physician bases on the patient's

---

[2] See also Bright v. American Greetings Corp., 62 S.W.3d 381 (Ky. 2001).

[3] See Cepero v. Fabricated Metals Corp., 132 S.W.3d 839 (Ky. 2004); Osborne v. Pepsi-Cola, 816 S.W.2d 643 (Ky. 1991), superseded by statute on other grounds.

clinical presentation or reported symptoms when other evidence indicates that the patient is malingering. The clinical findings and opinions of a university evaluator are no more reliable than those of any other physician if based on a defective or incomplete history or a false clinical presentation.

The ALJ stated a reasonable basis for rejecting Dr. Mattingly's opinion that the accident caused the claimant to have a disabling psychiatric condition. After summarizing the evidence in detail, the ALJ found the history that the claimant and his girlfriend related to Dr. Mattingly to be suspect and noted that Dr. Mattingly based her opinion that the accident caused a marked change in his behavior on that history. Moreover, other evidence indicated that the claimant deliberately chose incorrect responses during testing. When reciting the evidence, the ALJ noted Dr. Mattingly's concessions that his presentation was consistent with malingering and that his admitted use of marijuana could affect his behavior. Noting that Dr. Shraberg attributed the claimant's behavior to an underlying personality disorder rather than to the effects of the accident and that Dr. Granacher attributed no neuropsychiatric disturbance to the accident, the ALJ determined that their testimony was more persuasive than Dr. Mattingly's. The decision was reasonable under the evidence and properly affirmed on appeal.[4]

The decision of the Court of Appeals is affirmed.

All sitting. All concur.

_____

[4] Special Fund v. Francis, 708 S.W.2d 641, 643 (Ky. 1986).

COUNSEL FOR APPELLANT,
RONALD MYERS:

Thomas Wayne Moak
Moak & Nunnery, PSC.
P.O. Box 510
Prestonsburg, KY  41653


COUNSEL FOR APPELLEE,
PRIVATE INVESTIGATIONS AND COUNTER INTELLIGENCE, INC.:

Barry Lewis
Lewis and Lewis Law Offices
151 E. Main Street, Suite 100
P.O. Box 800
Hazard, KY  41702-0800